THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STATE AUTO PROPERTY AND :
CASUALTY INSURANCE CO. :
:
       **Plaintiff** :
v. : **3:11-CV-1796**
: **(JUDGE MARIANI)**
JOSEPH BONK t/a JOSEPH BONK :
AND SON, GARY and TAMMY KELLAR :
:
       **Defendants** :

## MEMORANDUM OPINION

### I. Introduction

Presently before the Court are cross-motions for summary judgment filed by Plaintiff

State Auto Property and Casualty Insurance Company ("State Auto") (Doc. 26) and

Defendants Gary and Tammy Kellar ("Kellars") (Doc. 29). Plaintiff filed this action seeking a

declaration from this Court that it owed no duty to defend or indemnify its insured, Alfred

Bonk ("Bonk"), in an underlying state court action brought by the Kellars against Bonk and

other defendants. In that case, Gary Kellar ("Kellar") alleged that he sustained serious

injuries on August 20, 2009 when he fell approximately eighteen feet from a roof on which

he was working for "Bonk or [Joseph] Dante, or both" (Underlying Complaint, Doc. 27-2, Ex.

B, ¶ 8) on a demolition project. For the reasons set forth below, the Court will deny both

Motions for Summary Judgment because there are several genuine issues of material fact

which must be resolved at trial.

## II. Statement of Undisputed Facts

At the time relevant to this case, Bonk had a Commercial General Liability insurance policy ("Policy") with Plaintiff State Auto. (Policy, Doc. 27-3, Ex. C). Under the Policy, one of the exclusions was "Employer's Liability" which encompassed:

"Bodily injury" to:
(1) An "employee" of the insured arising out of and in the course of:
    (a) Employment by the insured; or
    (b) Performing duties related to the conduct of the insured's business.

(*Id.* at 52 (Section I.2.e)). Under the Policy, the term "employee" "includes a 'leased worker'" but "does not include a 'temporary worker.'" (*Id.* at 62 (Section V.5)). A "'[l]eased worker' means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. 'Leased worker' does not include a 'temporary worker'." (*Id.* at 63 (Section V.10)). "'Temporary worker' means a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (*Id.* at 65 (Section V.19)). The parties dispute whether Kellar was an employee of Bonk but do agree that he was not a leased worker. They also dispute whether he was a temporary worker.

At the time of Kellar's fall, Bonk was in "[l]andscape work . . . , small demolition, trucking and excavation." (Bonk Dep. 1, Doc. 27-5, Ex. E, at 15:2-3). This work included "dig[ging] basements, cellars" using a backhoe and light demolition involving "a house or a

shed or a little garage or something." (Id. at 17:1-18). Bonk "could pull the walls out," but he was "not a builder," "an electrician," or "a roofing contractor." (Id. at 23:2-8).[1]

In July 2009, Raymond Hassay accepted Bonk's proposal to demolish the former Kost Tire building in Wilkes-Barre and to "cut [the] roof by hand to separate from other bldg's [sic]." (Acceptance of Proposal, Doc. 27-14, Ex. N). Bonk felt the job was supposed to be "a two day job . . ." and it began on Tuesday, August 18, 2009. (Bonk Statement to Erie, Doc. 29-17, Ex. I, at 6; Dante Dep., Doc. 27-6, Ex. F, at 36:3-5).

Because of his purported lack of experience with roofing work, Bonk contacted Joseph Dante ("Dante") to ask Dante whether he was interested in removing the roof from the Kost Tire building. "He needed some work. He said he was just finishing a job up, him and his helpers, whoever they were. And I said I had this roof, 'if you's want to cut the roof,' because he's a professional roofer, so I figured I would give him the job." (Bonk Dep 1, at 25:19-24; see also Dante Dep., at 33:15-23).[2]

Bonk and Dante had a verbal agreement in lieu of a written contract, as had been their practice in times past. (Bonk Dep. 1, at 26:2-8). Bonk and Dante agreed that Dante and "a couple of guys" he would bring would earn $15 per hour each. (Id. at 69:10-19; see also Bonk Dep. 2, Doc. 27-9, Ex. I, at 154:12-21; 155:5-17). The other "guys" were

---

[1] As far as roofing work, Bonk claimed he had "never" done it and did not "even know how to line [shingles] up." (Id. at 23:9-13). Whether roofing work was a regular part of Bonk's business is a matter reserved for trial.

[2] Bonk and Dante disagree where they had the conversation, but they agree that Bonk approached Dante about the job and Dante accepted.

3

Nicholas Punko ("Punko") and Kellar, who learned about the job through Dante. (Kellar Dep., Doc. 27-7, Ex. G, at 39:21-40:4; 41:9-12; Dante Dep., at 35:16-36:17).[3]

Bonk had the authority to fire "[a]ll of us if he wanted to." (Dante Dep., at 204:5-8; *see also* Kellar OSHA Statement, Doc. 27-10, Ex. J, at 4 ("Bonk had the power to hire or fire workers, he would instruct us daily, Dante would tell us what Bonk wanted.")). Bonk also confirmed that he had the authority to kick Dante or Punko off the job site. (Bonk Dep. 2, at 142:3-6).

Bonk provided hand-axes, access to a Bobcat, a saw, and torches. Scaffolding and a dumpster were already there when Dante arrived. (Dante Dep., at 58:7-19; 110:5-111:10; 128:18-22; Bonk Dep. 1, at 84:14-17; Bonk Dep. 2, at 50:7-11, 67:20-68:7; Kellar OSHA Statement, at 3).[4] In addition to what Bonk provided, Kellar brought some of his own equipment and tools, which included a "regular pouch, hammer, utility knife," and "a tape measure, [and] the ladder." (Kellar Dep., at 43:19-23; 121:16-20).

On the third day of the job, Kellar was working on the roof with the saw when he "fell through the roof." (Dante Dep., at 149:2-4). Kellar then "hit [the ground] hard," "bounced across the floor," and was "out cold." (*Id.* at 161:4-12). When Dante reached Kellar, Kellar was bleeding "bad[ly]" from his "head and elbows" and his bone had gone "right through the elbow." (*Id.* at 164:12-16; *see also* Punko Dep. at 40:5-8).[5]

---

[3] Bonk claims that he never met Kellar and did not know who he was at the time of Kellar's fall. (*See infra*).

[4] However, Bonk claims the scaffold was not his. (Bonk Dep. 2, at 86:25-87:13).

[5] The parties dispute what happened after Kellar's fall. Bonk claims that he remained on-site until the paramedics transported Kellar to the hospital. (Bonk Dep. 2, at 94:24-97:1). Dante testified that Bonk "got in the

4

Following the accident, Kellar submitted a claim for worker's compensation benefits which resulted in a hearing before Judge Mark Peleak on June 22, 2010. (Workers' Compensation Hearing Transcript, Doc. 27-13, Ex. M). However, Kellar voluntarily withdrew his claim before Judge Peleak issued an order.[6] Kellar also filed a civil lawsuit against Bonk, Dante, and the Kost Tire building owners in the Court of Common Pleas of Luzerne County. (Underlying Complaint, Doc. 27-2, Ex. B). In his complaint, Kellar alleged that he "was a laborer for either Dante or Bonk, or both, and was required to complete demolition of a roof at a building." (*Id.* at ¶ 8). State Auto then filed this Declaratory Judgment action here. (Doc. 1).

## III. **Statement of Disputed Facts**

From this point forward, Bonk, Dante, Punko, and Kellar have sharply divergent accounts of what occurred at the site, who had which responsibilities, and what level of interaction, if any, Bonk had with Kellar.

Bonk described the job as a "very, very simple job," although he himself did not possess "the expertise to do it." (Bonk Dep. 1, at 32:10-18). He also confirmed that "tearing . . . down" roofs could be considered a part of his demolition business, but that separating the roof from the building had to be done by a professional roofer. (*Id.* at 33:8-13). At his deposition, Kellar replied "no" to the question, "[d]id you consider yourself a professional

---

truck and left." (Dante Dep., at 101:22-23). After Kellar's fall, Bonk claimed to have finished the roofing job, himself. (Bonk Dep. 2, at 155:18-156:8).
    [6] According to Bonk, because neither Bonk nor Dante carried workers' compensation insurance, Kellar filed a claim with the Uninsured Employer Guaranty Fund. (Bonk Brief in Opposition, Doc. 38, at 2).

5

roofer?" (Kellar Dep., at 21:6-9). He also said he did not consider himself an "experienced roofer," either because "I ain't that good. I mean, yeah, I could lay shingle and stuff, but I'm not experienced or anything," despite having laid shingles for approximately twenty years. (Id. at 17:21-18:3, 21:10-16).

Bonk also claims he admonished Dante that he did not "want no more debris going out on the road" because it was a safety hazard. (Bonk Dep. 1, at 74:4-22). He also "told [Punko to] stay out of the building. If they were going to be throwing stuff down. I told him to have his hard hat on, his safety goggles and his hearing protectors and his safety shoes." (Bonk Dep. 2, at 141:8-12). Punko denies that Bonk ever gave him any sort of safety instructions. (Punko Dep., at 36:5-7, 37:1-3, 38:5-7).[7]

Dante testified that they all met on site on the first day of the job, and that when he arrived, Bonk was giving instructions to Punko and Kellar: "cut six-inch lap back and let it hand over to the building that was coming off to that building, as that part had to be saved, and leave enough lap on there for – so the water wouldn't get in." (Dante Dep., at 37:9-38:3). Dante further stated that he witnessed Bonk give instructions directly to Kellar and Punko, by directing Kellar to go on the roof and Punko to stay inside and help load debris. (Id. at 213:20-214:18). Dante testified that on the first day, Bonk told "[e]verybody" to "get

---

[7] For the roofing job, Bonk says he provided a "trailer with all the safety gear, shovels, rakes, brooms, whatever is needed, a fire hose, stuff like that" which was open all day long for workers to use. (Bonk Dep. 2, at 17:8-23). The trailer included body harnesses, lanyards, a rope, tie-offs. (Id. at 151:1-8). According to Bonk, however, Dante stated that the roofers did not need the safety equipment "because it was a flat roof and it had the parapet walls up on top." (Id. at 29:10-15). Dante and Punko testified that Bonk did not provide safety equipment, such as harnesses, lanyards, or tie-offs. (Dante Dep., at 112:18-113:1; Punko Dep., at 36:8-14). This dispute further illustrates that the key witnesses in this case agree on very little.

up there and slice the roof in the sections and roll it off the side." (*Id.* at 119:22-120:3). Punko also states that "Al met us down there in the morning and told us what he wanted done." (Punko Dep., at 20:19-20). Bonk, however, claims that he never spoke to Kellar directly, and that he gave instructions only to Dante and Punko. (Bonk Dep. 2, at 141:1-142:2).

Having provided a saw to Dante, Bonk "told [Dante] what he had to cut and [Dante] went up on the roof and looked at it and said, yes, he knew." (Bonk Dep. 1, at 84:16-25; *see also* Bonk Dep. 2, at 67:20-68:7; 78:12-24, 135:7-9; Dante Dep., at 207:2-3). Bonk stated that "Joe was in charge of the job. . . . Whatever I told Joe to saw cut. I mean, he knew what to do." (Bonk Dep. 1, at 73:6-12). "Mr. Dante was told what to do by me." (Bonk Dep. 2, at 153:6-9). Kellar confirmed that Dante was the one who informed the crew about what Bonk wanted them to do. "I understand Mr. Bonk hired us to come down and rip the roof off. (Kellar Dep., at 112:21-25). "I thought we were working for Bonk." (Kellar OSHA Statement, at 2). "Bonk was on site in the mornings, told Joe what had to be done, Joe would tell them, Gary + Nick, what to do." (*Id.* at 3). Kellar said that "if anything went wrong, we talked to Joe, and Joe would relay it to Bonk." (Kellar Dep., at 67:14-18).

Although the job was to remove the roof, Bonk additionally instructed Dante and the crew to take the garage down. Dante complied because "[i]t didn't matter. He was paying me $15 and I did whatever he told me." (Dante Dep., at 130:1-14). Bonk had a different

7

version of events: "the door was down already. [Dante] snipped the – I think he cut one of the wires on it. . . . [H]e only like snipped the wire that holds it." (Bonk Dep. 2, at 146:3-13).

On the first two days of the job, Dante, Punko, and Kellar stopped working at approximately 2:00 p.m. because of the summer heat. (Dante Dep., at 55:4-15, 73:21-74:4). On the evening of the first night, Dante says that Bonk called him "yelling at [Dante's] wife because I left at 2:00 o'clock. . . ." (Id. at 74:5-11). On the day of the accident, Bonk "asked [Dante] why we left," and Dante responded, "[i]t was too hot." (Id. at 75:12-15). Bonk "was sort of mad because we left. He wasn't up there, so I didn't care what he thought." (Id. at 75:20-22). Bonk, however, says that he "wasn't upset" and he "didn't care if they left. . . . They came and left as they felt." (Bonk Dep. 2, at 66:18-25). He also claimed that though he "didn't think [he] got his money's worth out of the day" "for having three men there," he did not let anybody know that he was upset because he is "an easy going guy." (Id. at 67:8-19).

In the past when Dante worked for Bonk, Bonk said he paid Dante either by cash or by check and "always" provided a 1099 form to Dante. (Bonk Dep. 1 at 26:18-25). On this occasion, even though Dante, Punko, and Kellar had not completed the job, Bonk paid Dante $660 in cash in an envelope for Dante's and Kellar's work, along with a 1099. (Id. at 33:14-25; see also Bonk Dep. 2, at 123:15-124:2). Bonk, however, paid Punko $330 directly for Punko's share of the work. (Bonk Dep. 1, at 34:5-35:25). With regard to Kellar, Bonk said, "I paid him, but I didn't pay him personally. . . . I wasn't paying him at all. I never

8

paid him. I gave Joe Dante the money for his helpers." (Bonk Dep. 2, at 133:13-25). Dante testified that when Bonk delivered payment, Bonk instructed him to say that Dante and his crew had been on the job site to take lumber and were not working for Bonk when the accident occurred. Bonk allegedly also said, "If you know what is good for you – or you'll lose your house." (Dante Dep., at 168:23-169:9). When asked at his deposition whether he had ever told Dante to lie about being Bonk's employee, Bonk replied, "That's a lie. I will tell him right to his face. That's a lie, a straight out lie. I mean, why would I do something like when he is there on a job?" (Bonk Dep. 2, at 124:17-24). Dante stated that he later sent the 1099 back to Bonk, because he felt a 1099 was improper, and he implied that Bonk issued a 1099 to avoid the appearance that he was Kellar's employer. (Dante Dep., at 208:12-24).

When Bonk gave his statement to Erie Insurance, he said, "I didn't even know the man [Kellar]. I have no idea who he even was until, you know, after it happened to the fact. I hired Joe Dante. He's a professional roofer." (Doc. 29-17, Ex. I, at 5). He also characterized Dante as "the sub-contractor." (Id.). Bonk stated Dante "was the guy. He was doing the separation on the roof for me. I mean it was only just a couple, like a two day job is what it was I am saying." (Id. at 6; see also Bonk Dep. 2, at 131:1-5). "And then this other guy [Kellar] . . . these other guys he had there I don't know where he hired them. I don't know how they even got involved there. Joe was supposed to be doing, he was supposed to do the job." (Erie Statement, at 6). He said as much at his deposition: at the

9

time of the accident, "I didn't know the man from Adam. I never met him in my life." (Bonk Dep. 1, at 24:2-4; see also Bonk Dep. 2, at 64:16-19; 65:1-4).

Despite the above statements Bonk made to Erie and at his depositions, the OSHA investigation yielded the following: "Bonk is considered the controlling employer because he: was originally hired to do the demolition work, obtained a permit to do the work, owned the truck and Bobcat on site, and rented a demolition saw for the workers to use when one was needed for the roof work." (OSHA Worksheet, Doc. 32-3, Ex. Q, at 3). In addition, although Bonk "reported he did not know the man who fell from the roof and said he knew there were people coming in and out taking usable materials, . . . interviews indicated an employer[-]employee relationship existed." (Id.).

## IV. Analysis

### a. Standard of Review on Motion for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer

10

specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

In this case, the parties have filed cross-motions for summary judgment. (Doc. 26; Doc. 29). According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). Each movant must show that no genuine issue of material fact exists; if both parties fall to carry their respective burdens, the court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008). When reviewing each motion, the court is bound to view the evidence in the light most favorable to the nonmovant. FED.R.CIV.P. 56; *United States v. Hall*, 730 F. Supp. 646, 648 (M.D. Pa. 1980).

### b. Discussion

"In a declaratory judgment action to determine whether a claim is covered, the court resolves the question of coverage. The court's role in the declaratory judgment action is to

11

resolve the question of coverage to eliminate uncertainty." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 542 (Pa. 2010) (internal citations omitted). "In order to determine whether a claim may potentially come within the coverage of the policy, [a court] must first ascertain the scope of the insurance coverage and then analyze the allegations in the complaint." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 948 A.2d 834, 845 (Pa. Super. Ct. 2008). "An insurer who disclaims its duty to defend based on a policy exclusion bears the burden of proving the applicability of the exclusion." *Erie Ins. Co. v. Muff*, 851 A.2d 919, 926 (Pa. Super. Ct. 2004).

Under Pennsylvania law, the "interpretation of an insurance contract is a question of law." *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 170 (Pa. 2005). A court's "purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance." *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007).

## Was Kellar Bonk's Employee?

"[A] determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case." *Universal Am–Can, Ltd. v. Workers' Comp. Appeal Bd.* (Minteer), 762 A.2d 328, 330–31 (Pa. 2000). The Pennsylvania Supreme Court in *Hammermill Paper* stated that:

> While no hard and fast rule exists to determine whether a particular relationship is that of employer-employee or owner-independent contractor, certain guidelines have been established and certain factors are required to be taken into consideration: Control of manner work is to be done;

12

responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 392 (Pa. 1968). However,

"[w]hether some or all of these factors exist in any given situation is not controlling. . . . **Our**

**case law confirms, that control over the work to be completed and the manner in**

**which it is to be performed are the primary factors in determining employee status**."

*Shay v. Flight C Helicopter Servs., Inc.*, 822 A.2d 1, 14 (Pa. Super. Ct. 2003) (citing

*Universal Am-Can*, 762 A.2d at 333) (finding that there existed disputes of fact as to

whether the plaintiff was an independent contractor or employee) (emphasis in original).

"[A]ctual control or direction over the work is not necessary to find an employer-employee

relationship. Instead, it is the purported employer's *right* to direct or control the manner of

work that is relevant." *Id*. (emphasis in original).

The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

*Urbano v. STAT Courier, Inc.*, 878 A.2d 58, 61, 62 (Pa. Super. Ct. 2005) ("Accordingly, the

disputed facts, along with evidence of the parties' written agreement, are for the jury to

13

consider when resolving the ultimate question of whether an employee/employer

relationship existed as alleged by Appellant.").

Defendant Kellar claims that the "uncontroverted testimony of Mr. Bonk, principal

owner of Bonk & Sons, given (1) to OSHA; (2) to Erie Insurance; (3) to the Workers'

Compensation Board; and (4) at his own deposition establishes that Mr. Kellar was not an

employee of Bonk & Son." (Doc. 31, at 6). In support of his argument, Kellar cites to the

various statements given by Bonk:

1. I didn't know the victim's name and he was not working for me. He was not a sub-contractor for me. I don't know how guy got on site. There were some people coming in and out taking useable material like 2 x 4's, insulation, and lights. (OSHA written statement, Doc. 29-16, Ex. H, at 3).

2. "I didn't even know the man. I have no idea who he even was until, you know, after it happened to the fact. I hired Joe Dante. He's a professional roofer. . . . Joe was supposed to be doing . . . the job." (Erie statement, Doc. 29-17, Ex. I, at 6). Also, "Joe brought [Kellar] there. Joe hired him. They came there with their own truck or whatever. They had their car. I had no idea. I didn't even know the guy. I never seen him in my life." (*Id.* at 14).

3. "I didn't know [Kellar] from Adam. Never met him." Instead, Bonk characterized Kellar as a "[s]elf-contractor" rather than an employee and denied ever having any contact with Kellar. (Worker's Compensation Hearing, Doc. 29-21, Ex. J, at 153:9-23, 154:2-3, 10-12).

4. At his deposition, Bonk gave the following answers to the following questions:

Q: Was he your employee?
A: No.
Q: Well, you say "No." Did you ever interview him?
A: I never interviewed him. I never had his social security number. I didn't know the man.

…

14

Q: Now, sir, you have never told anyone that Mr. Kellar was your employee, is that correct?

A: Did I tell anybody he was my employer (sic)?

Q: Did you tell State Auto he was your employer or he was your employee?

A: No.

Q: Did you tell Erie Insurance he was your employee?

A: No.

Q: Did you tell Judge Peleak he was your employee?

A: He wasn't employed by me.

Q: Did you tell OSHA he was your employee?

A: No. I told OSHA I didn't even know the guy. (Bonk Dep. 1, at 24:5-11, 27:8-25).

According to Defendant Kellar, Bonk's consistency in stating that he never knew Kellar and that Kellar was never an employee of Bonk's conclusively demonstrates there was no employer-employee relationship between the two. However, Bonk's self-serving characterizations of his relationship with Kellar are not dispositive. Rather, the Court must look to the factors listed above to determine what the status of Kellar was with respect to Bonk.

Although "a determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case." *Universal Am–Can,* 762 A.2d at 330–31, the "unique facts" of this case are heavily disputed by the parties, which prevents this Court from granting either of the motions for summary judgment. In cases with similar disputes, the Pennsylvania courts have found the cases should go to trial for resolution of disputed facts. For instance, in *Urbano,* the Pennsylvania Superior Court determined that the plaintiffs had "alleged additional facts found outside the agreements" which warranted submitting the issue to the jury. 878 A.2d at 62.

Appellant alleged in the complaint that Appellees directed and controlled the manner and method of the drivers' activities and performance during the workday. The complaint contained allegations that Appellees supplied Appellant and the members of the class with the vehicles and tools utilized by them in the course of their work and required them to dress in a uniform identifying them as a STAT and/or STATRANS representative. The complaint also contained allegations that Appellant and members of the class were named as employees under a policy of workers' compensation insurance obtained by Appellees and that Appellees paid them according to the number of hours worked per day. These specific claims were denied by Appellees, therefore the facts remain in dispute.

*Id.* Similarly, in *Shay*, the state appellate court "conclude[d] that Plaintiff presented sufficient evidence such that the trial court properly denied Defendants' Motion for Non–Suit/Directed Verdict on this issue and, therefore, the trial court properly submitted to the jury the question of whether Bratkovics was Defendants' employee." 822 A.2d at 14.

Here, although it is undisputed that Bonk provided some tools and equipment in the form of a saw, Bobcat, a dumpster, and torches[8] to the roofers and that he had the authority to hire and fire workers,[9] there are disputes as to who was in control of the job, its progress, the laborers, and other factors the Court must consider.

Control of the job, which is the most important factor, is hotly contested. While Bonk acknowledges that he told Dante where to make the initial cut and to take the roof off, he claims Dante was the one who decided the manner in which the work was done. According to Bonk, "Joe was in charge of the job," and as the professional roofer, "he knew what to

---

[8] Dante Dep., at 58:7-19; 110:5-111:10; 128:18-22; Bonk Dep. 1, at 84:14-17; Bonk Dep. 2, at 50:7-11, 67:20-68:7; Kellar OSHA Statement, at 3.

[9] Dante Dep., at 204:5-8; Kellar OSHA Statement, at 4; Bonk Dep. 2, at 142:3-6.

do."[10] Kellar confirms that he received his instructions from Dante, through Bonk.[11] However, Dante claims that Bonk gave specific instructions to both Punko and Kellar on what to do: "cut six-inch lap back and let it hand over to the building that was coming off to that building, as that part had to be saved, and leave enough lap on there for – so the water wouldn't get in."[12] Punko supports Dante's account: "Al met us down there in the morning and told us what he wanted done."[13]

Likewise, Dante says that Bonk was angry that the roofing crew left at 2:00 pm the first two days of the job due to the heat,[14] whereas Bonk stated that he was not upset the roofers left early because they "came and left as they felt."[15] In relation to safety, Bonk claims he instructed Punko on how to work in a safe manner.[16] Punko denies that Bonk ever gave him any safety instructions.[17] Although Bonk claimed the job was "very, very, simple," he lacked the expertise to do it himself.[18] And yet, after Kellar's accident, he claimed he finished the job, himself.[19] Furthermore, Kellar claimed that even after twenty years' experience, he was not a very good roofer,[20] which would suggest that the job required little skill. Nevertheless, such a conclusion would be an improper finding of fact.

---

[10] Bonk Dep. 1, at 73:6-12.
[11] Kellar OSHA Statement, at 2-3.
[12] Dante Dep., at 37:9-38:3, 119:22-120:3, 213:20-214:18.
[13] Punko Dep., at 20:19-20.
[14] Dante Dep., at 55:4-15, 73:21-75:22.
[15] Bonk Dep. 2, at 66:18-25.
[16] Bonk Dep. 2, at 141:8-12.
[17] Punko Dep., at 36:5-7, 37:1-3, 38:5-7.
[18] Bonk Dep. 1, at 32:10-18.
[19] Bonk Dep. 2, at 155:18-156:8.
[20] Kellar Dep., at 21:6-9, 17:21-18:3, 21:10-16.

Finally, Bonk and Dante dispute whether Bonk ever instructed Dante to lie about working for Bonk and whether he threatened Dante: "If you know what is good for you – or you'll lose your house."[21]  Bonk characterizes Dante's testimony as a "straight out lie,"[22] which presents a classic credibility question to be resolved at trial.  Given that Punko called Bonk "nothing but a lying thief" (Punko Dep., at 34:9-10) and Dante said Bonk was "[n]o Goddamned good" (Dante Dep., at 171:25-172:1), it is clear the primary witnesses in the case are hostile to one another, which further exemplifies the need for the Court to resolve issues of fact at trial.[23]

Because of the many genuine issues of material fact, the Court will deny the motions for summary judgment with respect to whether Kellar was Bonk's employee at the time of Kellar's fall.

### Was Kellar a Temporary Worker?

In the alternative, Kellar urges the Court to find that he was a temporary worker which would entitle him to coverage under the Policy.  The Policy defines "temporary worker" as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (Policy, at 65 (Section V.19)).

Defendants do not assert that Kellar was a substitute for a permanent employee on leave, so the question is whether he was "furnished" to Bonk to meet seasonal or short-term

---

[21] Dante Dep., at 168:23-169:9.

[22] Bonk Dep. 2, at 124:17-24.

[23] The Court notes that though OSHA found Bonk was the "controlling employer on site" (OSHA Worksheet, Doc. 32-3, Ex. Q), this was not a judicial determination and is, therefore, not binding on this Court.

workload conditions. There is no doubt that the three-day roofing project would constitute a

"short-term workload," so the Court must determine whether Kellar was "furnished" to Bonk.

The few courts to have addressed the meaning of the phrase "furnished to you" have

reached the following conclusion:

> It is clear that to be "furnished," something or someone must be supplied,
> provided, or equipped to another entity or person. Thus, the phrase,
> "furnished to you," when read together with the entire sentence, refers to a
> person supplied, provided, or equipped to the insured to substitute for a
> permanent employee or to engage in seasonal or short term work. Here,
> there is no evidence to suggest that Samantha or her employment was
> supplied, provided, or equipped to Gardner. Therefore, Samantha does not
> qualify as a temporary worker, irrespective of the brevity of Samantha's
> employment. Samantha is an employee subject to the employer's liability
> exclusion.

*Nautilus Ins. Co. v. Gardner*, No. Civ.A. 04-1858, 2005 WL 664358, at *7 (E.D. Pa. Mar. 21,

2005); *see also Empire Fire and Marine Ins. Co.*, 739 F. Supp. 2d 746, 765 (M.D. Pa. 2010)

("we find that Mr. Kalman did not *supply* or *furnish* Drumheiser to Mr. Jones. Mr. Kalman

merely recommended Drumheiser to Jones with the understanding that Drumheiser would,

in good faith, continue to do work for Kalman, and that Jones would not interfere with this

relationship," in particular because Kalman admitted he had no control over Drumheiser's

choice of employer) (emphasis in original).

Here, there is some evidence to indicate that Dante "supplied, provided, or

equipped" Kellar to Bonk. Nevertheless, to prevent conflicting findings of fact, the Court will

19

reserve ruling on whether Kellar a "temporary worker" until it resolves all of the outstanding factual disputes at trial and will deny summary judgment on this issue without prejudice.[24]

## Was Bonk Kellar's Statutory Employer?

Because the Court already has concluded there are several genuine issues of material fact as to whether Kellar was Bonk's employee, it is precluded from resolving the issue of whether Bonk was Kellar's statutory employer under the Workers' Compensation exclusion and will therefore deny summary judgment without prejudice on the matter.

### Should This Court Decline Jurisdiction over this Declaratory Judgment Action?

Bonk argues that this Court should decline to exercise jurisdiction over this action because the state court jury will decide whether Kellar was Bonk's employee.

> In order to determine who is at fault for Kellar's damages, the jury must determine the "employment" relationship between Kellar and Bonk and the "employment" relationship between Kellar and Dante. In making this decision the jury will determine whether Kellar was an independent contractor, a subcontractor of Bonk and/or Dante, or an employee of Bonk and/or Dante. Clearly, the determination of this issue will bring an end to the inquiry at hand – "Was Bonk an employer and was Kellar his employee?"

> In addition, even if this Honorable Court makes a determination concerning whether coverage applies, the county case will continue so the jury can decide whether Bonk, and/or Dante, and/or the Hasseys share responsibility, including whether Mr. Kellar himself contributed to his injuries.

(Bonk Brief, Doc. 38, at 11-12). In turn, State Auto argues that "[t]he issue of liability will turn on who was in possession and control of the work area where the accident occurred, not on whether Kellar was employed by Bonk or Dante." (Doc. 42, at 8). Based on the

---

[24] A review of the docket sheet and pleadings reveals that no party has demanded a jury trial under FED. R. CIV. P. 38(b). As such, under FED. R. CIV. P. 38(d), the parties have waived their right to a jury trial.

limited briefing on the issue, the Court does not have sufficient facts to determine whether the issue of Kellar's employment actually is pending in state court. Thus, the Court will deny summary judgment without prejudice on this issue.

However, the Court agrees the argument raised by Bonk warrants further attention from this Court. Therefore, the Court will enter an Order directing the parties to submit briefs in accordance with the briefing schedule set forth in the aforementioned Order.

## V. Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Summary Judgment (Doc. 26) and deny Defendant Kellars' Motion for Summary Judgment (Doc. 29). A separate Order follows.

Robert D. Mariani
United States District Judge